Filed 1/22/26  S&S Engineering and Construction v. Ashby Enterprises CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| S&S ENGINEERING AND CONSTRUCTION et al., Plaintiffs and Appellants, v. ASHBY ENTERPRISES, LLC, et al., Defendants and Appellants. | G062701, G063229 (Super. Ct. No. 30-2018-01000374) O P I N I O N |

Appeals from a judgment and postjudgment order of the Superior Court of Orange County, Richard Y. Lee, Judge. Affirmed.

Alston, Alston & Diebold and Donald A. Diebold for Plaintiffs and Appellants.

Law Offices of Stephen T. Cummings and Stephen T. Cummings; Benedon & Serlin, Melinda W. Ebelhar and Kian Tamaddoni for Defendants and Appellants.

S&S Engineering and Construction (S&S), doing business as Custom Auto Body, and Chad Susag (collectively, plaintiffs) cross-appealed from a judgment and postjudgment order. Following a bench trial, the trial court found in favor of defendants Ashby Enterprises, LLC (Ashby), Salmon Run Property Management, LLC (Salmon Run), and Myles Sachs (collectively, defendants) on all of plaintiffs' claims, except their negligent misrepresentation claim.[1] The court awarded damages on plaintiffs' negligent misrepresentation claim but reduced the award based on comparative fault. It also found the parties' commercial lease was an illegal contract. After the entry of judgment, plaintiffs filed a motion for attorney fees pursuant to the attorney fees clause in the illegal contract, a motion the court denied.

On appeal, plaintiffs argue the trial court erred by denying rescission and restitution and by reducing the damages based on comparative fault. They also argue the court erred by denying their motion for attorney fees. We disagree and affirm.

## FACTUAL BACKGROUND

Sachs's parents owned a building through Ashby, their family-owned company. In 2008, the City of San Juan Capistrano (City) issued a certificate of use and occupancy for the building, which Jubilee Church had used. Generally, when any alterations are made to a building space, a certificate of occupancy is issued at the conclusion of inspections to certify the space meets local requirements for occupancy. The City's municipal code required buildings to have a valid certificate of occupancy before they were

---

[1] Defendants appealed from the judgment but subsequently dismissed their appeal.

occupied.[2] According to the 2008 certificate of occupancy, the premises were 11,337 square feet (premises).

In 2013, Iglesia Cristiana (Iglesia) moved to the premises and applied for a modification of a conditional use permit with the City. According to the application, "[t]he original [conditional use permit] was granted to Jubilee Church in 2006 and the site has since operated as a church. Most recently, the owner of the property modified the interior space of the suite and reduced the area used for church services. The entry to the church is also shared with an adjacent business (gym) that is situated in the location of the former Jubilee Church sanctuary." Iglesia then submitted a building permit application, which included a floorplan of the premises depicting the church and gym suites. The City approved Iglesia's modification of the conditional use permit and issued a building permit.

In 2014, after his parents' death, Sachs became a member and manager of Ashby. Thereafter, the tenants of the gym vacated their unit. Sachs turned to his lifetime friend Schuyler Lifshultz to help him manage the building and delegated lease negotiations to him. Lifshultz was not a professional property manager and did not hold a real estate license. He had minimal knowledge of the modifications to the premises. Sachs did not

---

[2] City Municipal Code former section 8-2.02, subsection 111.1 provides: "No building or structure shall be used or occupied, and no change in the existing occupancy classification of any building or structure or portion thereof shall be made until the Building Official has issued a certificate of occupancy for said building or structure in accordance with the provisions of Section 111.2. Issuance of a certificate of occupancy shall not be construed as an approval of a violation of the provisions of this code or of other ordinances of the City. Certificates presuming to give authority to violate or cancel the provisions of this code or other ordinances of the City shall not be valid."

participate in and did not have knowledge of any of the modifications before he assumed responsibility over Ashby.

Lifshultz knew Ashby needed a valid certificate of occupancy to lease commercial space. Before leasing the premises, Lifshultz searched the City's website for the certificate and in the Sachs's family office. When he could not find a certificate, he called the City. The City informed him it had an existing certificate of occupancy for the premises, the 2008 certificate of occupancy, and "the space was free of any sort of citations or violations." Lifshultz advised Sachs that, based on the City's explanation, the premises had a certificate of occupancy, and Sachs accepted the City's explanation.

In November 2014, Susag, the owner of an automobile repair shop known as S&S, met with Lifshultz regarding leasing the premises. Lifshultz represented the premises were ready to lease. According to Lifshultz, he told Susag the premises had a valid certificate of occupancy and that he had confirmed it with the City. Susag said he would need to install a spray paint booth, a metal fixture that encloses a vehicle during painting to prevent contamination. While negotiating the lease, Sachs was present but Lifshultz spoke the majority of the time.

Before entering into a lease, Susag visited the City's planning department and asked what he needed to do to move his business to the premises. The City told him to move his business license. It also showed Susag the zoning map and confirmed the premises complied with zoning requirements. Susag did not discuss a certificate of occupancy with the City. Susag also checked the City's website and found documents regarding the premises, including Iglesias's 2013 building permit application.

4

In December 2014, Susag and Lifshultz met. According to Lifshultz, he was reluctant to lease the premises to Susag, but Susag assured Lifshultz that Susag contacted the City and "did his own due diligence."

In early 2015, plaintiffs entered into a lease with Salmon Run, Ashby's leasing agent. The lease had a five-year term between February 1, 2015, and February 29, 2020.[3] It described the rental space as "8[,]269 [square feet] est. of warehouse unfinished space . . . 700 [square feet] front common area." The base rent was $7,442.10 per month.

In January 2015, plaintiffs moved to their new space on the premises. During plaintiffs' tenancy, Iglesia used the other space adjacent to them on the premises.

In April 2017, the Orange County Fire Authority inspected the premises and cited S&S for, inter alia, operating an unpermitted spray paint booth. It also instructed S&S to obtain a valid certificate of occupancy. In the subsequent months, the City gave notice to S&S regarding various fire code violations and mandated compliance. The City also told S&S to obtain a new certificate of occupancy that covered any unpermitted improvements done on the premises, including partitions, since the issuance of the 2008 certificate of occupancy.

After a meeting in September 2017 between the City, S&S, and Ashby, S&S stopped paying rent. Ashby filed an unlawful detainer action against S&S. The trial court found S&S did not pay rent in September, October, and November 2017. It also determined the lease was an unlawful contract and declined to enforce it, as the premises had unpermitted

---

[3] The lease indicated the term ended on "Feb 31st, 2020," which we interpret to mean the last day of the month—February 29, 2020.

partitions and the certificate of occupancy was invalid at the time of the lease.

In March 2018, S&S vacated their space on the premises.

PROCEDURAL BACKGROUND

In June 2018, plaintiffs filed a complaint against defendants. Plaintiffs alleged four causes of action: (1) fraud, deceit, and intentional misrepresentation; (2) negligent misrepresentation; (3) breach of contract; and (4) unfair business practices. They sought, inter alia, "repayment of all rent paid."

I.

TRIAL

The case went to a court trial. As relevant here, the parties disputed whether the premises had a valid certificate of occupancy when they entered into the lease. Plaintiffs argued the unpermitted partitioning of the premises invalidated the existing 2008 certificate of occupancy and, because of the absence of a valid certificate of occupancy, the lease was illegal and void. Defendants argued the premises had a valid certificate of occupancy and the lease was lawful.

At trial, plaintiffs' expert, Paul Armstrong, who had worked as a building official for roughly 16 years, testified as follows. Changing the conditions of a building—conditions that were subject to an existing certificate of occupancy—would invalidate that certificate. A new use, not encompassed by the existing certificate, would require a new certificate. For example, subdividing a large space into smaller spaces would require a new certificate for each space. Another example would be: if unpermitted work were performed after the issuance of a certificate, the certificate would become invalid. At the time the parties entered into the lease, a change of

6

conditions had invalidated the 2008 certificate of occupancy. That certificate, issued for Jubilee Church, covered 11,337 square feet and referred to a single unit on the premises. But according to Iglesia's 2013 conditional use permit, there were two suites, one for a gym and another for a church, indicating a subdivision of the premises after the 2008 certificate was issued.

Armstrong opined Lifshultz's investigation was incomplete. Lifshultz's telephone call to the City was insufficient. If any work was done on the premises, the City was unlikely aware of them and, when Lifshultz called the City, the City probably only checked if there was a certificate of occupancy on file. It would have been "best to go and get the documentation" from the City. In response to the question whether Susag should have done "some valuation to see whether the intended space had . . . a certificate of occupancy," Armstrong testified, "Everybody should do that kind of research when they are moving into a new location."

Defendants' expert Hunter Starkey, a licensed professional engineer, testified as follows. The 2008 certificate of occupancy was "active" when the parties entered into the lease. A certificate would become invalid once the local jurisdiction declared it invalid.

Susag testified the absence of a valid certificate of occupancy did not impact S&S at the beginning of the lease. He testified S&S was "getting the benefit of [its] rent" in using the premises from the summer of 2015 to the summer of 2017. During the summer of 2017, S&S had to halt its spray painting and find a different location for this work.

## II.

### THE TRIAL COURT'S PRELIMINARY OBSERVATIONS

The parties filed a joint request for a statement of decision. After the parties rested, the trial court provided preliminary observations and

7

responses to the parties' joint request in a September 2022 minute order as follows.

The trial court initially determined the partitioning of the premises invalidated the 2008 certificate of occupancy. Therefore, the premises lacked a valid certificate of occupancy when the parties entered into the lease, and Ashby was unable to rent the space in the lease.

On the intentional misrepresentation and unfair business practices claims, the trial court found in favor of defendants. As for the breach of contract claim, while defendants breached the contract, the court was unsure if the breach of contract claim could lie where the contract was illegal, given the lack of a valid certificate of occupancy.

On the negligent misrepresentation claim, the trial court found in favor of plaintiffs. It determined the following. Lifshultz represented to plaintiffs "there was a valid [c]ertificate of [o]ccupancy," which was false. Defendants had no "reasonable ground for believing the representation was true when they made it" and intended plaintiffs to rely on the representation. Plaintiffs reasonably relied on defendants' representation and were substantially harmed by that representation. Defendants were not "able to rely upon the City [b]uilding[] department[']s representations and building records in 2014 that there were no building violations and a [c]ertificate of [o]ccupancy was in existence for the premises when leased to [p]laintiffs." (Capitalization omitted.)

## III.

THE TRIAL COURT'S REQUEST FOR SUPPLEMENTAL POINTS AND AUTHORITIES

Additionally, in the September 2022 minute order, the trial court requested the parties to file supplemental points and authorities regarding the following: "Assuming the [c]ertificate of [o]ccupancy was invalid at the

8

time of execution of the lease and assuming the [c]ourt intends to enforce the unlawful contract to prevent unjust enrichment by the [d]efendants, the [c]ourt asked the following questions: [¶] 1. Is rescission or restitution the appropriate remedy?[;] [¶] 2. Does the [c]ourt have discretion to award less than 100 [percent] rescission for restitution?"

In response to the questions, Plaintiffs argued rescission and restitution were appropriate remedies for an aggrieved party to an illegal contract. They contended equitable relief was not available to defendants and "[t]here [was] no basis to provide a reduction from the rescission and restitution that would benefit the [d]efendants who caused the illegal contract."

Defendants argued restitution is available only to an innocent party, the plaintiffs were in pari delicto, and therefore the plaintiffs should not be granted relief. Defendants asserted the courts have broad discretion to provide an equitable remedy.

IV.

THE TRIAL COURT'S RULING

In an October 2022 minute order, the trial court found in favor of defendants on all the causes of action, except the negligent misrepresentation cause of action. As to that cause of action, the trial court found in favor of plaintiffs. But the court explained there was comparative fault: while defendants should have known of the problems with the certificate of occupancy, Susag lacked sophistication and shared some responsibility. In reviewing Susag's testimony, the court found Susag did little to investigate the issue of the certificate of occupancy. Accordingly, the court assigned 50 percent of the responsibility to plaintiffs.

9

The trial court awarded damages to plaintiffs in the amount of $135,676.10. The court calculated damages as follows: it discounted a $2,500 payment (a November 2017 check) from the plaintiffs' measure of damages, $273,852.11, and then reduced the sum by 50 percent. The court explained Susag was "entitled to rent due to him being damaged by the [d]efendants['] negligence in the amount of the rent payments and common area payments that he paid from the beginning of the [tenancy] until the September 2017 joint meeting when it became apparent to him that the certificate of occupancy was going to be an issue." The court also awarded prejudgment interest.

As to the breach of contract cause of action, the trial court concluded the lease was illegal and void from the outset. The court explained: "The [c]ourt declines [p]laintiffs' invitation to find [d]efendants were unjustly enriched in the full amount of the lease and therefore is entitled to restitution and rescission and that the [c]ourt should enforce other provisions of the contract. The [c]ourt is not going to enforce the contract. The [c]ourt finds that the contract was unlawful. The [d]efendants brought an unlawful detainer action. The [c]ourt in that case did not enforce the terms of the contract. For this [c]ourt to enforce the terms of the contract and award [p]laintiffs the full amount of rent paid would result in an unjust enrichment to the [p]laintiffs. For these reasons, the [c]ourt is not going to find in favor of the [p]laintiffs on the breach of contract claim and will not enforce the contract."

The parties withdrew their joint request for a statement of decision, and the trial court entered judgment.

10

## V.

### THE TRIAL COURT'S DENIAL OF ATTORNEY FEES

After the judgment, plaintiffs moved for attorney fees and costs. They argued they were entitled to attorney fees pursuant to the lease. The lease contained an attorney fees clause, which provided in pertinent part: "If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party . . . in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorney[] fees. . . . The Term, 'Prevailing Party' shall include, without limitation, a party or broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense." Plaintiffs asserted they could enforce the attorney fee clause notwithstanding the trial court's finding that the lease was an illegal contract, citing *Yuba Cypress Housing Partners, Ltd. v. Area Developers* (2002) 98 Cal.App.4th 1077 (*Yuba Cypress*). Defendants opposed the motion, arguing, inter alia, plaintiffs could not enforce the illegal contract and were not the prevailing party.

The trial court denied the motion for attorney fees but granted the stipulated amount of costs. It found plaintiffs were not the prevailing party, explaining: "In its [October 2022] order, the [c]ourt expressly stated: 'the [c]ourt is not going to find in favor of [p]laintiffs on the breach of contract claim and will not enforce the contract.' [Citation.] [Civil Code] section 1717 expressly states that attorney[] fees are recoverable by 'the party prevailing on the contract.' (Civ. Code, § 1717, subd. (a).) Here, [p]laintiffs are not the prevailing party on the contract." The court also found, "[W]here a contract is

11

deemed illegal, attorney[] fees are not recoverable pursuant to the illegal contract."

Plaintiffs timely appealed from the judgment and postjudgment order.

## DISCUSSION

### I.

### THE TRIAL COURT AWARDED DAMAGES AND DECLINED TO ENFORCE THE ILLEGAL CONTRACT

At the outset, we clarify what type of remedy the trial court provided to plaintiffs. On the one hand, plaintiffs assert the court denied rescission and restitution and reduced damages based on comparative fault. On the other hand, defendants posit the court granted rescission of the lease and restitution of half of the paid rent. Plaintiffs are correct in their interpretation of the remedy.

In its October 2022 minute order, the trial court awarded damages and reduced the award based on comparative fault. This damage award was based on plaintiffs' negligent misrepresentation claim, which they had brought under tort law.[4] The court next addressed plaintiffs' breach of contract claim, concluding the lease was illegal and void. It stated it would

---

[4] It appears the parties understood plaintiffs brought their negligent misrepresentation claim under tort, rather than contract, law. In their joint request for a statement of decision, the parties asked the trial court to respond to the following question regarding negligent misrepresentation: "Did the [d]efendant(s) have *no reasonable grounds* for believing the representation was true when they made it?" (Italics added.) This question involves a requirement found in tort law under Civil Code section 1710 but not in contract law under Civil Code section 1572. The parties do not argue whether the trial court properly granted relief on the negligent misrepresentation claim based in tort rather than contract.

not enforce the contract, and did not provide any relief based on the illegal contract. Nowhere in its ruling did the court grant rescission or restitution.

Defendants argue "[p]laintiffs elected, and obtained, recission of the [l]ease," citing plaintiffs' supplemental points and authorities on remedies in the trial court. This argument lacks merit. Plaintiffs' supplemental points and authorities responded to specific questions by the court and indeed sought rescission and restitution. But the court made two assumptions behind its questions, including "assuming the [c]ourt intends to enforce the unlawful contract to prevent unjust enrichment by the [d]efendants." And the court acted contrary to this assumption underlying its questions: it declined to enforce the contract. Given the court did not enforce the contract, we cannot say plaintiffs still elected rescission. Significantly, the court appeared to reject the arguments for rescission and restitution set forth in plaintiffs' supplemental points and authorities, explaining in its ruling: "The [c]ourt declines [p]laintiffs' invitation to find [d]efendants were unjustly enriched in the full amount of the lease and therefore is entitled to restitution and rescission and that the [c]ourt should enforce other provisions of the contract."

## II.

## THE TRIAL COURT DID NOT ERR BY APPLYING THE DOCTRINE OF IN PARI

## DELICTO

*A. Standard of Review*

It is undisputed the lease here was an illegal contract.[5] After finding the lease was illegal, the trial court declined to provide an equitable remedy for the illegal contract. Given "the trial court exercised its equitable powers" in declining to provide an equitable remedy, we review the ruling under the abuse of discretion standard. (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1256; see *Walters v. Boosinger* (2016) 2 Cal.App.5th 421, 429) "A trial court's decision is an abuse of discretion if it is based on an error of law [citations] or if the court's factual findings are not supported by substantial evidence [citation]." (*Shapell SoCal Rental Properties, LLC v. Chico's FAS, Inc.* (2022) 85 Cal.App.5th 198, 213.)

*B. Analysis*

Plaintiffs argue S&S was not in pari delicto with Ashby and therefore S&S was entitled to recover all the rent paid under the lease. They assert the trial court erred by denying rescission and restitution of all the rent paid.

"Generally, an illegal contract may not serve as the basis for an action, either in law or equity." (*Aghaian v. Minassian* (2021) 64 Cal.App.5th 603, 622 (*Aghaian*).) Accordingly, "courts will deny relief to either party who has entered into an illegal contract or bargain which is

---

[5] "Rental agreements involving units that were constructed without building permits or lack a certificate of occupancy are ordinarily regarded as unlawful and void." (*Carter v. Cohen* (2010) 188 Cal.App.4th 1038, 1047 (*Carter*).)

against public policy." (*Tri-Q, Inc. v. Sta-Hi Corp.* (1965) 63 Cal.2d 199, 216 (*Tri-Q*).) In other words, courts will leave the parties "where they are found when they come to a court for relief." (*Tiedje v. Aluminum Taper Milling Co.* (1956) 46 Cal.2d 450, 454.) This rule is referred to as the doctrine of in pari delicto. (*Tri-Q, supra,* 63 Cal.2d at p. 216.)

"By refusing to entertain the enforcement of illegal contracts, courts maintain their integrity while at the same time deterring the formation of such contracts. [Citations.] Such a rule also 'prevent[s] the guilty party from reaping the benefit of his wrongful conduct,' and 'protect[s] the public from the future consequences of an illegal contract.'" (*Aghaian, supra*, 64 Cal.App.5th at p. 622.)

The rule "is not absolute." (*Aghaian, supra*, 64 Cal.App.5th at p. 622.) It does "not necessarily apply to both parties to the agreement unless both are truly in pari delicto." (*Tri-Q, supra*, 63 Cal.2d at p. 218.) "'[T]he fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered.'" (*Aghaian,* at p. 622.) "[C]ourts should not apply the general rule when: (1) the public cannot be protected because the transaction has been completed; (2) no serious moral turpitude is involved; (3) the defendant is the one guilty of the greatest moral fault; and (4) to apply the rule will permit the defendant to be unjustly enriched at the expense of the plaintiff. [Citations.] 'In such circumstances, equitable solutions have been fashioned to avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.'" (*Ibid.*) "'In each case, how the aims of policy can best be achieved depends on the kind of illegality and the particular facts involved.'" (*Tri-Q,* at p. 220.)

"One type of situation in which the rule is inapplicable is described in *Lewis & Queen [v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 153]:

15

'[W]hen the Legislature enacts a statute forbidding certain conduct for the purpose of protecting one class of persons from the activities of another, a member of the protected class may maintain an action notwithstanding the fact that he has shared in the illegal transaction. The protective purpose of the legislation is realized by allowing the plaintiff to maintain his action against a defendant within the class primarily to be deterred. In this situation it is said that the plaintiff is not in pari delicto.'" (*Carter, supra*, 188 Cal.App.4th at p. 1048.)

Plaintiffs argue *Carter* is analogous to the instant case. *Carter* involved a tenant seeking excess rent payments under a rent stabilization ordinance, even though the lease was illegal given the premises lacked a certificate of occupancy. (*Carter, supra*, 188 Cal.App.4th at p. 1046.) The court recognized the doctrine of in pari delicto. (*Id.* at pp. 1047–1048.) But it did not apply the rule, explaining: "[T]he [rent stabilization ordinance] was enacted to 'safeguard tenants from excessive rent increases' [citation]. . . . Here, Carter[, the tenant,] sought no benefits under the provisions of her lease agreements with Cohen: she relied on the agreements solely to establish that the rent she had paid exceeded the [rent stabilization ordinance] limits. Because '[t]he protective purpose of the legislation [was] realized by allowing [Carter] to maintain [her] action against [her landlord]' [citation], the trial court properly permitted her to assert her [rent stabilization ordinance] claim." (*Id.* at pp. 1048–1049.)

Unlike in *Carter*, which concluded the parties were not in pari delicto, the evidence here supports the trial court's finding the parties were in

16

pari delicto.[6] At trial, plaintiffs' expert Armstrong testified defendants conducted an insufficient investigation regarding whether they had a valid certificate of occupancy. But Armstrong also assigned blame to plaintiffs, stating Susag should have inquired further into whether the premises had a valid certificate of occupancy. Susag's investigation appeared cursory. He spoke with the City and asked what he needed to do to move to the premises, but he did not discuss a certificate of occupancy with the City. Susag also checked the City's website for documents regarding the premises. Therefore, Susag, on behalf of plaintiffs, shared responsibility with the certificate of occupancy issue. The particular facts involved here support the trial court's decision to apply the rule of in pari delicto, regardless of the protective purpose of the municipal law requiring a valid certificate of occupancy.

III.

PLAINTIFFS FAIL TO ESTABLISH THE TRIAL COURT ERRED BY REDUCING THE DAMAGE AWARD

In their opening brief, plaintiffs argue the trial court erred by reducing the damage award based on comparative fault. Defendants counter plaintiffs are barred from challenging the adequacy of the damage award because plaintiffs failed to move for a new trial before the court. Defendants

---

[6] Plaintiffs assert the trial court did not make a finding the parties were in pari delicto and that the parties did not request such a finding in their joint request for a statement of decision. "Under the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48.) Here, the parties did not secure a statement of decision. The trial court applied the rule of in pari delicto, declining to enforce the illegal contract, and therefore impliedly found the parties were in pari delicto.

17

argue plaintiffs' appeal rests in part on contesting two factual findings: (1) the finding of comparative fault and (2) the finding plaintiffs would be unjustly enriched if all rent paid were returned to them. Defendants assert, because substantial evidence supports these factual findings, plaintiffs were required to move for a new trial. In their reply brief, plaintiffs clarify they are not challenging the damage award. Rather, they argue they are challenging whether the trial court could reduce the damage award based on contributory negligence and comparative fault where an illegal contract was made.

We first address defendants' argument. "A failure to timely move for a new trial ordinarily precludes a party from complaining on appeal that the damages awarded were either excessive or inadequate, whether the case was tried by a jury or by the court." [Citation.] The power to weigh the evidence and resolve issues of credibility is vested in the trial court, not the reviewing court. [Citation.] Thus, a party who first challenges the damage award on appeal, without a motion for a new trial, unnecessarily burdens the appellate court with issues that can and should be resolved at the trial level. [Citation.] Consequently, if ascertainment of the amount of damages turns on the credibility of witnesses, conflicting evidence, or other factual questions, the award may not be challenged for inadequacy or excessiveness for the first time on appeal." (*Jamison v. Jamison* (2008) 164 Cal.App.4th 714, 719–720.) "The failure to move for a new trial, however, does not preclude a party from urging legal errors in the trial of the damage issue such as erroneous rulings on admissibility of evidence, errors in jury instructions, or failure to apply the proper legal measure of damages." (*Glendale Federal Savings and Loan Association v. Marina View Heights Development Company* (1977) 66 Cal.App.3d 101, 122.)

18

Here, plaintiffs failed to move for a new trial. The apportionment of fault is an issue for the trier of fact to address in "its allocation of fault among concurrent or alternative tortfeasors." (*Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 476.) As a question of fact regarding the scope of damages, plaintiffs were required to move for a new trial to preserve the issue on appeal. Therefore, they are precluded from challenging the adequacy of the damage award on appeal.

But it also appears plaintiffs are asserting a legal error. They argue, given the illegal contract, they were entitled to restitution of their rent paid and would not be unjustly enriched by return of all rent paid. They explain: "Issues of comparable fault are not elements to restitution involving illegal contracts; either the aggrieved party is in pari delicto and relief is denied, or the aggrieved party is not in pari delicto and relief is provided without offset because the offset would be an unjust enrichment of the party that caused the illegal conduct. The finding of an illegal contract cannot be ignored in order to reduce damages based upon comparative fault or negligence." (Italics omitted.)

This argument fails for two reasons. First, the interplay of restitution and comparative fault is not at issue here. The trial court did not award restitution. It awarded damages on plaintiffs' negligent misrepresentation claim based in tort and reduced the damages on the grounds of comparative fault. Second, as we explained *ante*, when the trial court found the lease was an illegal contract, it properly applied the doctrine of in pari delicto—that is, it declined to enforce the contract and provided no relief to the parties on that basis.

THE TRIAL COURT DID NOT ERR BY DENYING THE MOTION FOR ATTORNEY FEES

*A. Standard of Review*

"'On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law.'" (*Sanders v. Lawson* (2008) 164 Cal.App.4th 434, 438.) Here, both parties assert de novo is the appropriate standard of review. But given plaintiffs are asking us to consider whether the parties were in pari delicto here in this context too, we apply the abuse of discretion standard of review.

*B. Analysis*

Plaintiffs argue the trial court's ruling contradicts *Yuba Cypress* and the parties were not in pari delicto. In *Yuba Cypress*, the plaintiff sought rescission of his real estate contract with the defendant and recovery of money that he had paid to the defendant pursuant to the contract. (*Yuba Cypress, supra*, 98 Cal.App.4th at p. 1080.) The plaintiff prevailed. (*Ibid.*) He chose to disaffirm, rather than to affirm, the contract, which the trial court had deemed illegal, but was still awarded reimbursement. (*Id.* at pp. 1080–1081.) The plaintiff then moved for attorney fees and costs based on an attorney fee clause in the contract. (*Id.* at p. 1080.) The defendant argued, inter alia, the plaintiff, having obtained rescission of the contract, could not enforce the attorney fee clause, as the entire contract was void because of its illegality. (*Ibid.*) The trial court concluded the attorney fee clause was enforceable. (*Ibid.*)

The appellate court held the "defendant is estopped from asserting that its violation of the Subdivided Land Act [(Bus. & Prof. Code, § 11000 et seq.)] voided the entire contract, including the attorney fees clause; otherwise, defendant would benefit from its own wrong." (*Yuba Cypress, supra*, 98 Cal.App.4th at p. 1081.) It acknowledged courts typically will decline to enforce an illegal contract. (*Id.* at p. 1082.) Thus, "there is no need for a mutual right to attorney fees since neither party can enforce the agreement." (*Id.* at p. 1082.) Nonetheless, the appellate court applied the exception to in pari delicto and explained: "[W]hen a plaintiff purchased land under a contract that does not comply with the act, courts will allow the plaintiff to enforce the contract against the seller or to disaffirm the contract. [Citation.] In other words, the contract is *voidable not void*; since it does not have an illegal object, it is not one which *neither* party may enforce such that an attorney fee clause contained therein also is unenforceable." (*Id.* at p. 1083, first italics added, second italics in original.) The appellate court concluded: while the plaintiff elected to void the contract, he was not barred from seeking attorney fees pursuant to the attorney fee clause in the contract; "[r]ather, defendant, who violated the Subdivided Lands Act, is estopped from asserting the invalidity of the contract." (*Ibid.*)

*Yuba Cypress* is readily distinguishable from the instant case. *Yuba Cypress* applied the exception to in pari delicto and determined the contract was voidable (i.e., to give plaintiffs the option to affirm or disaffirm the contract). Here, in contrast, the trial court did not apply the exception and deemed the illegal contract void. As a result, the court here did not give the plaintiffs the option to affirm or disaffirm the contract. The contract was unenforceable.

Plaintiffs argue the illegal contract here, just as the illegal contract in *Yuba Cypress*, had no illegal object. To some extent, that is true. The contract here was a commercial lease (as opposed to, for example, a contract for illicit goods), and the illegality resulted from the lack of a certificate of occupancy in violation of a municipal law. Nevertheless, whether a court applies the exception to in pari delicto depends not only on the type of illegality but also "'the particular facts involved.'" (*Yuba Cypress, supra,* 98 Cal.App.4th at p. 1082.) And, as we discussed *ante*, the particular facts here supported the trial court's decision to apply the doctrine of in pari delicto. Therefore, the trial court properly denied plaintiffs' motion for attorney fees.[7]

---

[7] Plaintiffs also contend *Carter* contradicts the trial court's analysis. They assert *Carter* "specifically provides that relief to enforce the lease may be provided to a tenant involved in an illegal lease that is void as a result of problems with the [c]ertificate of [o]ccupancy." *Carter* did provide such relief, but the basis of the relief stemmed from the trial court's balancing of the equities when considering the rent stabilization ordinance at issue, not merely the certificate of occupancy. (*Carter, supra,* 188 Cal.App.4th at pp. 1048–1049.) *Carter* determined: "Because '[t]he protective purpose of the legislation [was] realized by allowing [Carter] to maintain [her] action against [her landlord]' [citation], the trial court properly permitted her to assert her [rent stabilization ordinance] claim." (*Id.* at p. 1049.)

## DISPOSITION

The judgment and postjudgment order are affirmed. Defendants shall be entitled to costs on appeal.

MOTOIKE, ACTING P. J.

WE CONCUR:

MOORE, J.

GOODING, J.